

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00107-CR

Guadalupe **CONTRERAS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CR4792
Honorable Ron Rangel, Judge Presiding

Opinion by:   Rebeca C. Martinez, Chief Justice

Sitting:   Rebeca C. Martinez, Chief Justice
Adrian A. Spears II, Justice
H. Todd McCray, Justice

Delivered and Filed: July 1, 2026

AFFIRMED

A jury convicted appellant, Guadalupe Contreras, of one count murder and one count aggravated assault with a deadly weapon. The trial court set aside aggravated assault with a deadly weapon in accordance with double jeopardy-standards[1] and sentenced Contreras to seventy-five years' confinement for the murder of Elizabeth Contreras.

---

[1] Contreras's first trial, held in June 2023, resulted in a mistrial.

In three issues on appeal, Contreras contends (1) the trial court erred when it denied his motion to suppress, (2) the evidence is insufficient to support his murder conviction, and (3) the trial court erred by admitting evidence of statements he made under custodial interrogation prior to being *Mirandized*. We affirm.

## I. Background

Contreras married decedent, Elizabeth Contreras, in 2016. The marriage did not last long, and they separated by the end of the year. Elizabeth returned to living with her first husband, Joe David Munoz Jr., and Contreras resumed his relationship with Elizabeth's stepsister, Alice Diaz. Although Elizabeth and Contreras had separated, the two began seeing each other again in a secret affair. Elizabeth had two cell phones, one of which was used to communicate with Contreras.

On the night of August 2, 2017, Elizabeth told Joe that she was going to work to pick up her schedule. Elizabeth never returned home. Joe reported Elizabeth missing and began to search for her.

On August 5, 2017, while Elizabeth was still deemed missing, Contreras and Alice agreed to be interviewed by police to assist in the investigation of Elizabeth's whereabouts. Police transported Contreras and Alice from 331 Marbach to the police station in a patrol car. Before Contreras's interview started, he completed a SIS form with his personal information, including his cell phone number. He told police the last time he had seen Elizabeth was the day before she went missing, when they met at his work to discuss adding Elizabeth to his insurance. He told police the last time he spoke to Elizabeth was on the day she went missing, and he did not know where she was.

While Elizabeth was still deemed missing, Contreras told Elizabeth's other sister, Jennifer Sierra DeJesus, that he had not seen or spoken to Elizabeth "in a very long time."

During Alice's interview, she told police that she was in a relationship with Contreras, they had two children, shared a bedroom and car, and she did not know about his relationship with Elizabeth. She also said that the clothing Contreras wore to work on the day Elizabeth went missing was still in their shared laundry hamper and had not been washed. Alice consented to a search of the bedroom during her interview, and again after her interview at 331 Marbach by signing a consent-to-search form. The clothing provided by Alice, identified as what Contreras wore to work on the day Elizabeth went missing, tested positive for the possible presence of blood. Elizabeth was not excluded as a contributor of DNA.

A few days later, Joe located the vehicle Elizabeth was driving when she went missing (hereinafter, "the vehicle"). Joe reported finding the vehicle and consented to a search. Elizabeth's personal belongings and a piece of plastic shrink wrap were found inside, and apparent blood was found throughout the vehicle. In the rear cargo area, crime scene investigators observed a blood pattern that appeared to be an outline of a body in the fetal position. Elizabeth was not excluded as a contributor of DNA. Contreras was excluded as a contributor of DNA.

On August 8, 2017, Elizabeth's body was found in a wooded area, in a heavily decomposed state, near the location where the vehicle was found. Branches appeared to be laying on top of her body. The medical examiner conducted an autopsy and deemed the manner of death to be homicide and the cause of death to be homicidal violence.

Location data emitted from Elizabeth's cellphone and Contreras's work truck shows that, on the night Elizabeth went missing, at 11:04 p.m., Elizabeth and Contreras were close in proximity near the dead end at Chive Drive. Investigators linked blood and hair fibers found on the pavement at Chive Drive to Elizabeth. Contreras's work truck stopped emitting data at 11:05 p.m. because it was turned off. There was no movement detected from 11:05 p.m. to 11:39 p.m.

Around 11:40 p.m., Elizabeth's cellphone traveled away from Chive Drive to the wooded area where her body was found; Contreras's cellphone emitted data from that same area at 11:43 p.m. From 11:52 p.m. to 11:55 p.m., Elizabeth's cellphone moved toward the area where the vehicle was found. From 11:55 p.m. to 12:10 a.m., Elizabeth's cellphone moved from where the vehicle was found toward Chive Drive. Around 12:11 a.m., Contreras's work truck was turned back on and began emitting data from Chive Drive. Contreras's work truck and Elizabeth's cellphone traveled from Chive Drive to where Elizabeth's phone and clothing were found; Contreras's truck was stationary in that location for approximately nine minutes.

Marvin Reyna, Contreras's manager at Elliot Electric, recalled that Contreras once returned from his lunch break "real mad" after arguing with his girlfriend about refusing to add her to his insurance. Reyna testified about several events that occurred on the night Elizabeth went missing. First, Contreras requested bubble wrap prior to going on his delivery route. Reyna found this to be unusual because Contreras's delivery did not include lights, and company policy allowed plastic wrap to be issued only when a delivery included lights. Second, a surveillance photo captured Contreras in the front lobby of the warehouse holding shrink wrap. Reyna testified there was no reason for Contreras to be in the front lobby. Third, Contreras was limping when he returned from his delivery route. Contreras told Reyna that he fell in the truck bed while removing shrink wrap that was stuck to the truck and injured his knee as a result. Reyna found this to be odd because Contreras did not deliver any palettes with shrink wrap that night. Reyna offered a workplace injury report which Contreras declined. Fourth, Contreras's work truck was monitored by GPS data that showed he traveled off his assigned delivery route. When confronted, Contreras admitted to breaking company policy by going off route.

After Contreras was arrested, police confronted Contreras with location data indicating that he met Elizabeth at Chive Drive on the night she went missing. Contreras stated they "always" met at Chive Drive and denied meeting her there that night.

## II. Sufficiency of the Evidence

We begin with Contreras's sufficiency challenge because we are obliged to address any arguments that, if meritorious, would result in rendition of judgment. *See Roberson v. State*, 810 S.W.2d 224, 225 (Tex. Crim. App. 1991) (per curiam). Contreras argues evidence presented by the State was insufficient to prove that he intentionally or knowingly caused Elizabeth's death.

### A. Standard of Review and Applicable Law

When determining whether there is sufficient evidence to support a criminal conviction, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt." *Cantu v. State*, 678 S.W.3d 331, 357 (Tex. App.—San Antonio 2023, no pet.) (citing *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991)). Direct evidence and circumstantial evidence are equally probative. *Tate*, 500 S.W.3d at 413. Circumstantial evidence alone may suffice if the cumulative force of such evidence is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

It is the jury's role to resolve conflicts in the testimony, assess credibility and weigh the evidence, and draw reasonable inferences from the basic facts to the ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We may not substitute our own judgment for

that of the jury. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The jury is entitled to draw multiple reasonable inferences from the facts as long as the evidence supports each inference. *Tate*, 500 S.W.3d at 413. However, a jury may not draw conclusions based on pure speculation. *Id.* Speculation, unlike a reasonable inference, is not sufficiently based on the evidence to support a finding beyond a reasonable doubt. *Id.* "When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict." *Id.* This presumption includes inferences from circumstantial evidence. *Huff v. State*, 467 S.W.3d 11, 19 (Tex. App.—San Antonio 2015, pet. ref'd).

Under the Penal Code, a person commits murder if they intentionally or knowingly cause the death of an individual or intend to cause serious bodily injury and commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

A person acts intentionally, or with intent, with respect to the nature of their conduct or to a result of their conduct when it is their conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge, with respect to the nature of their conduct or to circumstances surrounding their conduct, when they are aware of the nature of the conduct or that the circumstances exist. *Id.* § 6.03(b). A person acts knowingly, or with knowledge, with respect to a result of their conduct when they are aware that their conduct is reasonably certain to cause the result. *Id.*

## B. Analysis

The State did not present direct evidence, as there was no identifying witness, surveillance footage, or DNA evidence tying Contreras to the scene. In a sufficiency analysis "the question is not what evidence there isn't, it's what evidence there is." *See Acosta v. State*, 429 S.W.3d 621,

630 (Tex. Crim. App. 2014). "[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardner v. State*, 306 S.W.3d 274, 286 (Tex. Crim. App. 2009).

Here, Contreras and Elizabeth had a secret affair, and argued because Contreras would not add her to his insurance. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt.").

Contreras made suspicious and implausible statements about when he last spoke to Elizabeth. Contreras told DeJesus he had not seen or spoken to Elizabeth "in a very long time." He told police that he had last seen Elizabeth the day before she went missing and spoke to her by phone on the day she went missing. Contreras did not acknowledge Chive Drive or state that he met Elizabeth there until the day of his arrest when he was confronted with the location data. GPS data from the night Elizabeth went missing placed Elizabeth's cellphones and Contreras's work truck at Chive Drive at the same time, showed coordinated movements that indicate they were together, Contreras's work truck stopped for nine minutes at the location where Elizabeth's cellphones and clothing were found, and he returned to work injured. *See Gragg v. State*, 214 S.W.2d 292, 295 (App. 1948) (stating that a story contrary to the surrounding circumstances may be regarded as an expression of consciousness of guilt); *see also Thompson v. State*, 425 S.W.3d 480, 489 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (concluding evidence was legally sufficient to support jury verdict finding appellant guilty of murder where evidence included appellant's cell phone records indicating that his phone was located near the murder scene until the time of the shooting, then the phone moved towards appellant's residence on the other side of town).

While the exact nature of Elizabeth's death is unknown, she lost a significant amount of blood. Officers observed blood and hair fibers on the pavement at Chive Drive, the vehicle tested positive for the presence of blood in various locations, and in the rear of the vehicle there was an outline of someone who appeared to be in the fetal position. The clothing Alice gave police — what Contreras wore to work on the day Elizabeth went missing — tested positive for the possible presence of blood. Elizabeth was not excluded as a contributor of DNA from Contreras's clothing or the evidence found at Chive Drive.

Contreras argues that his phone calls with Elizabeth are not evidence of a murder but of an affair. He also argues the evidence regarding bubble wrap is "deeply problematic" because "the State's expert witness testified that the piece of evidence introduced in the record is shrink wrap while the material being sought from appellant's workplace was a bubble wrap." However, when the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict. *See Tate*, 500 S.W.3d at 413.

Based on the record, a rational juror could have found, beyond a reasonable doubt, that Contreras intentionally or knowingly caused Elizabeth's death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Elizabeth's death. Therefore, we overrule Contreras's sufficiency issue.

### III. Motion to Suppress

Contreras contends the trial court erred in denying his motion to suppress the clothing Alice gave officers because she lacked authority to consent to a search, and officers were obligated to further investigate Alice's authority to consent based on ambiguity as to whether she lived at 331 Marbach. Thus, he contends the search was unconstitutional.

**A. Standard of Review and Applicable Law**

In reviewing a trial court's ruling on a motion to suppress, appellate courts apply a bifurcated standard of review. *See State v. Hardin*, 664 S.W.3d 867, 871 (Tex. Crim. App. 2022). Appellate courts give almost total deference to the trial court's determination of historical facts and credibility when supported by the record. *See id.* Similarly, appellate courts afford almost total deference to a trial court's ruling on mixed questions of law and fact, if the resolution to those questions turns on the evaluation of credibility and demeanor. *Id.* at 871–72. When the trial court makes explicit fact findings, appellate courts determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. *Id.* at 872. Appellate courts review legal conclusions de novo. *Id.*

The Fourth Amendment to the United States Constitution guarantees people the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A warrantless search is per se unreasonable, "subject to certain 'jealously and carefully drawn' exceptions." *State v. Rodriguez*, 521 S.W.3d 1, 9 (Tex. Crim. App. 2017) (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)). One of the specifically established exceptions to the warrant requirement is a search conducted by consent. *Mendoza v. State*, 30 S.W.3d 528, 531 (Tex. App.—San Antonio 2000, no pet.).

A third party may provide valid consent for a search if that person has actual or apparent authority. *Rodriguez*, 521 S.W.3d at 19 (citing *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010)). Actual authority exists when a third party and the absent, non-consenting person share "common authority" over the premises or property. *Id.* Common authority is shown by

> mutual use of the property by persons generally having joint access or control for
> most purposes, so that it is reasonable to recognize that any of the co-inhabitants
> has the right to permit the inspection in his own right and that the others have

assumed the risk that one of their number might permit the common area to be searched.

*Hubert*, 312 S.W.3d at 560-61 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). Apparent authority exists when an officer "reasonably, though erroneously, believes that a third party purporting to provide consent has actual authority over the place or thing to be searched[.]" *Id.* at 561. "Apparent authority is judged under an objective standard: 'would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). "Reasonableness hinges on 'widely shared social expectations' and 'commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interest.'" *Rodriguez*, 521 S.W.3d at 19–20 (citing *Randolph*, 547 U.S. at 111; *State v. Copeland*, 399 S.W.3d 159, 163 (Tex. Crim. App. 2013)).

## B. Analysis

Contreras filed a motion to suppress the clothing Alice provided, which tested positive for the presence of blood. At the suppression hearing, the State relied on Alice's consent to justify the warrantless search. The State called Detective Tom McNelly, Officer Rockey Escobedo, and Crime Scene Investigator Juan Enriquez as witnesses. The trial court found them to be truthful and credible. Contreras called Alicia Guerra and Carmen Contreras as witnesses. The trial court did not find them to be credible. Based on the testimony elicited during the pretrial motion to suppress hearing, the trial court overruled the motion to suppress and entered the following written findings of fact:

> Alice Diaz told police that she lived at the house with Guadalupe Contreras, and that she did his laundry. Alice Diaz volunteered to give Contreras's clothes to the police. Police picked her up at that house for her interview and dropped her back there. This court finds that the officers reasonably believed that Alice Diaz had

common authority over Guadalupe Contreras's bedroom and clothes. The facts known to the officers at the time of the search demonstrate that they had an objectively reasonable basis to believe that Alice Diaz had actual and/or apparent authority to consent to the search of Guadalupe Contreras' bedroom and clothes hamper.

Thereafter, Contreras again raised the motion to suppress, and the trial judge allowed Alice to be called as a witness. After additional testimony from Alice, the court denied the motion in open court without issuing written findings.

At oral argument, counsel stated that Alice's mutual use of the property was not an issue, and relied primarily on *Corea v. State*, 52 S.W.3d 311 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd), for the proposition that ambiguity as to whether Alice resided at 331 Marbach required further inquiry. In *Corea*, the trial court held that the defendant's brother-in-law, who resided in the defendant's apartment, had apparent authority to consent to a search of the defendant's bedroom. *Id.* at 315. The Court of Appeals reversed, explaining that the brother-in-law's authority to consent "became ambiguous once he told the officers no one other than [the defendant] lived in [the defendant's] bedroom." *Id.* at 316. The court reasoned that the defendant could exclude the brother-in-law from room, and there was no evidence that defendant consented to his brother-in-law entering the bedroom, or that he had ever entered the bedroom with or without the defendant's consent. *Id.* The court held that the State cannot meet its burden to prove a third party has authority to consent when the officer is "faced with an ambiguous situation" and "nevertheless proceed without making further inquiry." *Id.* at 317. When faced with ambiguity, officers are "obligated to investigate further to determine if [the third party] truly ha[s] the authority to consent to a search of the bedroom or to obtain a search warrant." *Id.*

Alice's authority arguably became ambiguous once she told officers that her home address was 4227 Dysart and listed another address on her SIS form. However, unlike *Corea*, any ambiguity regarding where Alice lived was clarified during the interview. Detective McNelly's

follow-up questions clarified that Alice's father lived at 4227 Dysart and she visited for dinner, she was staying with Contreras, she and Contreras shared a bedroom and car, and she drove Contreras to work and back home. Detective McNelly asked Alice if she would object to giving police consent to search the home to look at the clothes Contreras wore to work on the day Elizabeth went missing. Alice responded "it is not my house to give consent to. The lady that you saw at the door, she is the owner of the home. If she allows you to go in, I have no problem with you going in." In response, Detective McNelly told Alice that he had to ask her if police could search the room because she resided at 331 Marbach and had a reasonable expectation of privacy. Alice did not refute that she lived at 331 Marbach, and invited officers to "go through all of [their] stuff," including "the clothes in the hamper." After the interview, Alice asked to be dropped off "back to the house," referring to 331 Marbach.

Alice's later testimony that she did not have a key to 331 Marbach was not part of what officers knew during the initial consent. Contreras has not directed us to, nor did we find, where Alice told police that she did not have a key to 331 Marbach or the bedroom. As Contreras asserts in his brief, "in denying the first motion to suppress [the court] relied on [Alice's] statement. And in her statement, there is no discussion, per se, of the fact that she does not have a key to [Contreras's] room."

Deferring to the trial court's determinations of credibility and historical fact, the officers may have reasonably believed that Alice had apparent authority to consent to the search. *See Giles v. State*, No. 08-01-00080-CR, 2003 WL 68178, at *4 (Tex. App.—El Paso Jan. 9, 2003, no pet) (mem. op., not designated for publication). ("Amy told the officers that she lived in the residence with Appellant and she agreed to allow them to look for the clothes used in the robberies . . . she assisted them in searching through the dirty laundry. All of this would lead a reasonable person

to believe that she truly did live in the residence and had common authority over the place searched.").

Because the evidence supports the officers' belief that Alice had authority to consent to a search of the bedroom, the search was reasonable, and the trial court did not err in denying the motion to suppress. We overrule Contreras's motion to suppress complaint.

### IV. Custodial Interrogation

In his third issue, Contreras argues that the trial court erred in denying his motion to suppress information he wrote on the SIS form while allegedly in custodial interrogation.

### A. Standard of Review and Applicable Law

When there are issues of pure fact, or of mixed questions of law and fact that turn on credibility or demeanor, and the case presents only questions of the validity of the trial court's legal rulings, our review is de novo. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). In deciding whether a person is in custody for purposes of applying *Miranda*, "[a]n appellate court both (1) conducts a factual review in examining the circumstances surrounding the interrogation, and (2) makes an ultimate legal determination whether a reasonable person would not have felt at liberty to leave." *State v. Saenz*, 411 S.W.3d 488, 493 (Tex. Crim. App. 2013) (citing *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995)).

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Statements made by a suspect during a custodial interrogation are inadmissible unless certain warnings were given to the suspect before he made those statements. *Id*. at 444–45.

"A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Hines v. State*, 383 S.W.3d 615, 621 (Tex. App.—San Antonio 2012, pet. ref'd) (internal quotation omitted). "The court of criminal appeals has recognized four situations that may constitute custody: (1) when a suspect is physically deprived of his freedom of action in any significant way; (2) when a police officer tells a suspect he cannot leave; (3) when a police officer creates a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and a police officer does not tell a suspect he is free to leave." *Id.* A defendant has the burden to establish he was in custody before the State bears the burden to show compliance with *Miranda*. *Id.*

## B. Analysis

At the first trial, Contreras objected to admission of his cell phone number from the SIS form, arguing he provided it while in custodial interrogation prior to being *Mirandized*. The trial court overruled the objection, finding that Contreras was not in custody at the time he completed the SIS form, and that Contreras voluntarily provided the information. At the second trial, Contreras raised the same objection; the trial court took all previous arguments into consideration and stood by its ruling. Contreras now argues "[t]he statements made prior to the warnings should be suppressed because no reasonable person would feel free to leave while being forced into a squad car and taken to the police station's interrogation room."

Contreras voluntarily went with officers to the police station to be interviewed, was not handcuffed, was left in the room alone to complete the SIS form, was told he was not under arrest and was free to leave, and was dropped off at home after the interview. Under the circumstances, a reasonable person in Contreras's situation would not have believed that he was restrained to the

degree associated with a formal arrest. *See Williams v. State*, 513 S.W.3d 619, 631–633 (Tex. App.—Fort Worth 2016, pet. ref'd) (upholding trial court's finding of no custody when appellant voluntarily agreed to accompany officers to police station, was transported in an unmarked police vehicle, was not restrained, was told she was not being arrested, and was eventually told she was seen as a suspect); *Allen v. State*, 479 S.W.3d 341, 350 (Tex. App.—El Paso 2015, no pet.) (concluding no custody when defendant voluntarily came to police station, was told he was not under arrest, was not physically restrained, and was left alone twice in interview room); *Dancy v. State*, 728 S.W.2d 772, 777–79 (Tex. Crim. App. 1987) (finding no custody when suspect voluntarily came with police to station, voluntarily answered questions, and was arrested at conclusion of interview).

Therefore, the trial court did not err by admitting his statements. We overrule Contreras's custodial interrogation issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.

Rebeca C. Martinez, Chief Justice

DO NOT PUBLISH